**MULVANEY MECHANICAL, INC., Plaintiff–Appellee,**

v.

**SHEET METAL WORKERS INTERNATIONAL ASSOCIATION, LOCAL 38, Defendant–Appellant.**

**Docket No. 00–7546.**

United States Court of Appeals, Second Circuit.

Argued Dec. 12, 2000.

Decided April 24, 2002.

Jeffrey S. Dubin, Law Offices of Jeffrey S. Dubin, Huntington, NY, for Defendant–Appellant.

Robert B. Mitchell, Bridgeport, Connecticut (David J. Kelly, Durant, Nichols, Houston, Mitchell & Sheahan, PC, Bridgeport, CT, of counsel), for Plaintiff–Appellee.

Margery E. Lieber, Washington, D.C. (Arthur F. Rosenfeld, John E. Higgins, Jr., John H. Ferguson, Nancy E. Kessler Platt, Jennifer R. Taylor, Special Litigation Branch, National Labor Relations Board, Washington, D.C., of counsel), filed a letter brief for the National Labor Relations Board as Amicus Curiae.

Mark S. Renner, San Jose, California (Wylie, McBride, Jesinger, Sure & Platten, San Jose, California; Patrick J. Riley, Sheet Metal Workers' International Association, Washington, D.C., of counsel), filed a brief for Sheet Metal Workers' International Association as Amicus Curiae.

Before: FEINBERG, CARDAMONE, and F.I. PARKER, Circuit Judges.

CARDAMONE, Circuit Judge.

Plaintiff Mulvaney Mechanical, Inc. (Mulvaney, employer, or company) brought suit to vacate an arbitration award

that required it as an employer to execute a new collective bargaining agreement with defendant, the Sheet Metal Workers International Association, Local 38 (Local 38, union, or appellant). Mulvaney had contracted originally with Local 38 through a multi-employer bargaining group, until the union decided in 1997 that it preferred to bargain with the employers individually. Local 38 and Mulvaney thereafter attempted to negotiate a new labor contract but, when they reached an impasse, the union authorized a strike upon the expiration of the existing collective bargaining agreement (agreement). Several months after the commencement of the work stoppage, Local 38 invoked the agreement's interest arbitration provision so that an arbitration panel could establish the terms of a new contract between it and the employer, thereby precipitating the present litigation.

■ On this appeal we deal with the issue of whether a breach by a union of a no-strike clause in a collective bargaining agreement repudiated that agreement and thereby justified the employer in rescinding the entire agreement. The doctrine in contract law that a material breach by one party to a contract constitutes such a repudiation as to justify the other party's unilateral rescission of the entire contract is not a legal concept that readily is transposed into the context of national labor law—as though the notion "one size fits all" applies in the law. On the contrary, in labor law there are other policies to consider, in particular the strong presumption in favor of arbitrability, which in this case preclude giving the employer the right to terminate the collective bargaining agreement solely on account of the union's breach.

## BACKGROUND

Up until 1997 Mulvaney, a Connecticut-based sheet metal contractor, was a member of a multi-employer bargaining group, the Associated Sheet Metal and Roofing Contractors of Connecticut, Inc. (Association). The Association secured workers for its member-employers by contracting with appellant, Local 38. The collective bargaining agreement between the Association and Local 38 was for a term of one year, but was automatically renewed on an annual basis unless a party requested that it be reopened. Article XIV of the agreement provides that if a party should elect to reopen the agreement at the end of the yearly term, the agreement should nevertheless remain in effect until the conclusion of "interest arbitration" before the National Joint Adjustment Board (National Adjustment Board or Board), an arbitration board comprised equally of employer and union members. "Interest arbitration" involves referring a dispute to an arbitration panel in order for it to establish the terms and conditions of a future collective bargaining agreement. It differs from the more typical grievance arbitration, which involves interpreting an existing employment contract to determine whether its conditions have been breached. See *Chicago Typographical Union No. 16 v. Chicago Newspaper Publishers' Ass'n*, 853 F.2d 506, 509 n. 6 (7th Cir.1988).

Article X, Section 8 of the agreement delineates the interest arbitration procedures to be followed upon the failure of the parties to negotiate the renewal of the existing contract. That section also prohibits the parties from engaging in a work stoppage, unless and until the National Adjustment Board formally notifies the parties that it was unable to reach a unanimous compromise decision:

[A]ny controversy or dispute arising out of the failure of the parties to negotiate

a renewal of this Agreement shall be settled as hereinafter provided:

. . . .

The dispute shall be submitted to the National Joint Adjustment Board pursuant to the rules as established and modified from time to time by the National Joint Adjustment Board. The unanimous decision of said Board shall be final and binding upon the parties. . . . There shall be no cessation of work by strike or lockout unless and until said Board fails to reach a unanimous decision and the parties have received a written notification of its failure.

### The Strike by Local 38

By letter of January 8, 1997 Local 38 informed the Association that the agreement between them was due to expire six months later on June 30, 1997 and that the union had elected to terminate its bargaining relationship with the multi-employer Association as of that date. This letter satisfied the requirement of § 8(d)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(d)(1) (1994), that required Local 38 to give Mulvaney at least 60 days advance notice of its intention to modify or terminate the agreement. The union planned thereafter to negotiate exclusively with the Association's individual member employers. As required by § 8(d)(3) of the NLRA, 29 U.S.C. § 158(d)(3), Local 38 sent a "Notice to Mediation Agencies" on January 21, 1997, apprising both the Federal Mediation and Conciliation Service and the New York State Employment Relations Board of its intention to terminate the collective bargaining agreement. Unfortunately, the union's notice identified the Association as the relevant party to the dispute rather than the individual employer, even though both parties had agreed to negotiate on an individual basis. In addition, the union failed to notify in a timely fashion the Connecticut Board of Mediation and Arbitration, which it was required to do since the Board qualified under the NLRA as a "State . . . agency established to mediate and conciliate disputes within the State . . . where the dispute occurred." *Id.*

Local 38 thereafter met with individual employers regarding the terms of a new collective bargaining agreement. It negotiated unsuccessfully with Mulvaney between May and June 1997. On June 19, 1997 the union informed Mulvaney that the employer's latest proposal was unacceptable, that the employees' position was "No Contract, No Work," and that Mulvaney would be subject to a work stoppage if the parties did not reach an accord prior to the June 30th expiration of the agreement. The Association, responding for its member employers, reminded Local 38 of the interest arbitration provision of the agreement and of the union's obligation not to strike until the National Adjustment Board deadlocked following a petition by the parties.

On June 25, 1997 Local 38 informed its members that the negotiations with the employers had failed and that a strike was authorized for July 1, 1997, one day after the expiration of the agreement. On July 1, 1997 members of Local 38 struck several sheet metal contractors, including Mulvaney, where six union members failed to report for work.

### Related Proceedings Following the Work Stoppage

Although Local 38 and Mulvaney continued to negotiate the conditions of a renewal agreement during the work stoppage, Mulvaney hired nine workers to replace its striking employees and allegedly ceased to honor the terms of the expired agreement. On July 2, 1997 the Association brought suit in the United States District Court for

the District of Connecticut (Covello, J.) in an unsuccessful attempt to enjoin the strike and enforce the interest arbitration provision of the agreement. During the course of hearings on the order to show cause, counsel for Local 38 took the position that the union had terminated its contract with the Association earlier and thus the interest arbitration provision did not apply:

> We terminated [the collective bargaining] agreement under its terms, and under the terms of article 14 even, it says that ... if there's an article 10 section 8 provision in the contract, which there was, it would go to the [National Adjustment Board], which is the normal course of events.

> But not in this case, because there are no negotiations for a renewal agreement, so article 10 section 8 does not apply. What does apply is the termination notice which we gave in January, and this contract ended two days ago, or three days ago.

▇ Local 38 took a similar position when it filed a petition for election with the National Labor Relations Board (NLRB) on October 30, 1997. Until the petition, Mulvaney's employees had maintained their relationship with Local 38 under § 8(f) of the NLRA, 29 U.S.C. § 158(f) (1994). That section provides that only in the building and construction industry may an employer enter into a collective bargaining agreement with a union even though the union has not been elected as a bargaining unit by a majority of the employer's workers. *See id.* At the conclusion of the term of the agreement, both the employer and the union can unilaterally repudiate the § 8(f) bargaining relationship. *See John Deklewa & Sons,* 282 N.L.R.B. 1375, 1377–78 (1987), *enforced sub nom. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v.*

*NLRB,* 843 F.2d 770 (3d Cir.1988). Local 38's election petition sought to certify the union under § 9 of the NLRA, 29 U.S.C. § 159 (1994), as the official bargaining representative for Mulvaney's employees; once certification under § 9 is in place that relationship cannot be repudiated unilaterally. *See id.* § 158(a)(1), (a)(5).

After the union's representation election, a hearing was held on January 29, 1998 before an NLRB hearing officer regarding Mulvaney's claim that 16 workers were ineligible to vote in the election because they had lost their status as "employees" following the strike. *See id.* § 158(d). At the hearing Local 38 took the position that the agreement with Mulvaney had expired on June 30, 1997, and accordingly that the workers did not lose their employee status under § 8(d) of the NLRA. *See id.*

On April 24, 1998 the hearing officer issued a report which found that the agreement was still in effect at the time of the strike, that Local 38 failed to fulfill the notice requirements of § 8(d)(3) of the NLRA and, as a result, five of Mulvaney's striking workers were ineligible to vote in the representation election. The hearing officer further found that Mulvaney had failed to prove that 11 other workers had participated in the strike and thus held that the challenged ballots of these workers should be added to the election's vote tally.

On October 14, 1998 the NLRB ruled that Local 38 had received a majority of the ballots cast in the representation election and certified that union as the exclusive collective bargaining representative of Mulvaney's employees. Mulvaney has since refused to bargain with Local 38— purportedly in an attempt to challenge the NLRB's certification—but in a May 6, 1999 decision, the NLRB found that Mulvaney's failure to recognize the union constituted an unfair labor practice. *Mulva-*

*ney Mech., Inc.,* 328 N.L.R.B. No. 46, 1999 WL 298517, at *2 (N.L.R.B. May 6, 1999). We have since granted a petition to enforce that decision. *NLRB v. Mulvaney Mech., Inc.,* 99–4176, 234 F.3d 1262, 2000 WL 1715231, at *3 (2d Cir. Nov.14, 2000) (summary order). Mulvaney is therefore obligated to bargain with Local 38 as its employees' official bargaining representative.

The distinct issue on this appeal is whether Mulvaney is bound by the terms of an existing labor agreement to execute the specific collective bargaining agreement that the National Adjustment Board has awarded in arbitration.

### The Present Dispute

Despite the previous representations that the agreement had expired, Local 38 on November 25, 1997 invoked the interest arbitration provision, Article X, § 8, to request that the National Adjustment Board assume jurisdiction over negotiations between the union and Mulvaney. The employer objected to arbitration arguing that Local 38 had terminated the agreement—including the interest arbitration provision—by its July 1, 1997 strike. The employer appeared at the National Adjustment Board's hearings solely to challenge jurisdiction. The Board nevertheless assumed jurisdiction, and on July 1, 1998 directed the parties to execute a 46 month collective bargaining agreement, effective immediately, incorporating the same terms as Local 38's "building trades" collective bargaining agreement.

On July 30, 1998 Mulvaney filed an action in Connecticut state court to vacate the arbitration award, primarily on the ground that the Board acted without jurisdiction. Local 38 removed this action to the United States District Court for the District of Connecticut (Chatigny, J.), basing federal question jurisdiction on

§ 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) (1994). In July 1999 the parties cross-moved for summary judgment, with the employer seeking to vacate the arbitration award and Local 38 seeking to enforce the award.

In a March 31, 2000 order the district court vacated the Board's award as extra-jurisdictional. It held that Local 38's strike constituted a repudiation of the agreement and that Mulvaney was thereby entitled to rescind the contract, including the interest arbitration provision. *See Mulvaney Mech., Inc. v. Sheet Metal Workers Int'l Ass'n, Local 38,* No. 3:98CV1750 RNC, 2000 WL 852430, at *3–*4 (D.Conn. Mar.31, 2000). From this order, Local 38 appeals.

### DISCUSSION

We review the district court's grant of summary judgment *de novo. Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir.2001). Such relief is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The underlying inquiry when reviewing such a grant is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Local 38 contends on appeal that the district court's grant of summary judgment vacating the arbitration award was error. Mulvaney counters that summary judgment was appropriate because the Board acted extra-jurisdictionally. Specifically, Mulvaney contends that the Board derived its authority solely from the interest arbitration provision of the agreement, and that either of two alternative grounds

supports a finding that the agreement had been terminated prior to its assumption of jurisdiction.

Initially, the company asserts the strike by the union—in violation of the no-strike clause of the collective bargaining agreement and in contravention of § 8(d) of the NLRA—*ipso facto* terminated the agreement. In the alternative, the employer insists the strike, coupled with the union's later pronouncements that the collective bargaining agreement had been terminated, constituted a repudiation of the agreement. This repudiation, Mulvaney's argument concludes, gave it the option of rescinding the agreement, an option that it exercised.

### I  The Strike Did Not *Ipso Facto* Terminate the Agreement

Under the terms of the interest arbitration provision of the agreement, the parties are prohibited from resorting to a work stoppage upon the expiration of the collective bargaining agreement, unless and until formal notification by the Board that it has failed to reach a unanimous decision. Local 38 admits that it failed to comply with the mandates of this no-strike provision. Moreover, we recognize that the strike contravened § 8(d)(3) of the NLRA, 29 U.S.C. § 158(d)(3), because the union failed, for example, to provide timely notification to the Connecticut Board of Mediation and Arbitration prior to engaging in the work stoppage. Mulvaney alleges that these two transgressions by the union—the strike and the failure to give notice ahead of time to the appropriate mediation agencies-operated in tandem to terminate the agreement *ipso facto* when the strike began.

### A.  *Notice Requirements*

Section 158(d) of the NLRA states in pertinent part

[T]he duty to bargain collectively shall also mean that no party to [a collective bargaining agreement] shall terminate or modify such contract, unless the party desiring such termination or modification—

. . . .

(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time.

29 U.S.C. § 158(d). The section further provides that "[a]ny employee who engages in a strike within any notice period specified in this subsection . . . shall lose his status as an employee of the employer engaged in the particular labor dispute, . . . but such loss of status for such employee shall terminate if and when he is reemployed by such employer." *Id.*

The employer maintains that Local 38's failure to notify the proper mediation authorities in a timely manner and to abstain from a work stoppage for a 60 day period from the date of notification, *see* § 158(d)(4), resulted in the loss of employee status for the striking workers under § 158(d). Since all of the union members employed by Mulvaney struck the employer—and in turn allegedly lost their employee status—the employer avers that Local 38's support of the strike resulted in the forfeiture of *its* status as the union representative of Mulvaney's employees. The company further declares that this loss of bargaining agent status led to the termination of the collective bargaining agreement because one of the parties to that agreement, *i.e.*, Local 38, had "judicially 'died.' "

In making this argument, Mulvaney primarily relies upon the D.C. Circuit's 1949 decision in *Boeing Airplane Co. v. NLRB,* 174 F.2d 988 (D.C.Cir.1949). In that case the union entered into an agreement with Boeing that contained a clause perpetuating the existing contract until a new agreement could be "reached by the parties either through negotiation or arbitration." *Id.* at 989. Despite this arbitration clause, the D.C. Circuit held that the union, having violated the notice provisions of § 8(d) and a no-strike clause in its contract, forfeited its "right to be considered as a collective-bargaining agent for the employees of the Company." *Id.* at 991. While we recognize that Local 38's illegal strike may have, for similar reasons, caused its members to lose their employee status, we decline to follow *Boeing* to the extent that it would compel us to hold that this loss of employee status necessarily terminated the collective bargaining agreement with the union. First, even if it is assumed that the union lost its status as the majority representative, the interest arbitration clause would not have become a dead letter. As in *American Metal Products, Inc. v. Sheet Metal Workers International Ass'n, Local Union No. 104,* 794 F.2d 1452 (9th Cir.1986), the collective bargaining agreement here purports to cover the "rates of pay and conditions of employment for *all employees*" and "does not require as a precondition to new contract negotiations an NLRB finding of an appropriate bargaining unit ... or *majority support of the Union.*" *Id.* at 1455 (emphases added). As such, even without the striking union members in the company's employ, the union's status as the collective representative of the remaining employees had not, under the collective bargaining agreement, "judicially 'died.'" In other words, even though the § 8(d) violation had a potentially devastating impact on the union employees, the immediate effect of the strike, given the language of the agreement in this case, did not make the union simply disappear. If, however, in the course of the union's representation, Mulvaney believes it "committed an unfair labor practice, [the employer] is free to file a complaint with the NLRB." *Id.*

Importantly, contrary to the above assumption, it is entirely conceivable that Mulvaney's bargaining relationship with Local 38 as the majority representative would continue even if all of the company's union employees were discharged. In the context of a dispute over whether a union maintained the majority of support of a unit of employees, the Supreme Court has upheld the NLRB's "no-presumption approach" to strike replacement workers. *NLRB v. Curtin Matheson Scientific, Inc.,* 494 U.S. 775, 788–89, 110 S.Ct. 1542, 108 L.Ed.2d 801 (1990). This approach rejects the assumption that replacement workers and strike crossovers ordinarily oppose the striking union; instead it insists that whether the union continues to enjoy the majority support of the employer's workers should be determined on a case-by-case basis. *See id.* at 781–82. *Curtin Matheson* premised its approval of the NLRB's approach, in part, on the notion that an anti-union presumption would countenance attempts by employers to rid themselves of union representation following a strike. *See id.* at 794–95, 110 S.Ct. 1542. Adopting the no-presumption approach limits an employer's opportunity to use the strike as a vehicle to terminate the bargaining relationship. As such, this approach "serves the policies of promoting industrial stability and negotiated settlements." *Id.* at 795, 110 S.Ct. 1542.

Mulvaney hired nine replacement workers during the course of Local 38's strike. A holding that the loss of employee status of the striking union workers terminated the collective bargaining agreement would

necessarily assume that these replacement workers did not want to be associated with the union, which would be inconsistent with the no-presumption approach approved in *Curtin Matheson*. *See generally* Michael H. LeRoy, *Strike Crossovers and Striker Replacements: An Empirical Test of the NLRB's No Presumption Policy*, 33 Ariz. L.Rev. 291, 320–31 (1991) (finding empirical support for NLRB's no-presumption policy). In fact, as factual support for the no-presumption approach in this case, we repeat that on October 14, 1998 the NLRB found that Local 38 had received a majority of the ballots cast in a post-strike representation election and certified the union as the exclusive bargaining representative of Mulvaney's employees under § 9 of the NLRA, 29 U.S.C. § 159. Consequently, the alleged loss of employee status of Mulvaney's workers did not necessarily terminate the bargaining relationship between the employer and the union.

■ Finally, even if the strike had dissolved the bargaining relationship between Mulvaney and Local 38, we are not persuaded that the collective bargaining agreement was terminated automatically. It is settled that when a union which is a party to an existing collective bargaining agreement is decertified, the successor union is not necessarily bound by the terms of the unexpired labor contract. *See NLRB v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 284 n. 8, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *see also Am. Seating Co.*, 106 N.L.R.B. 250, 255, 1953 WL 10942 (1953) (establishing this rule). Yet, Mulvaney fails to direct us to any authority holding that such termination of the agreement is automatic, rather than at the prerogative of the incoming union. Our precedents indicate it is not automatic. *See Abrams v. Carrier Corp.*, 434 F.2d 1234, 1244 (2d Cir.1970).

In *Abrams*, we expressed disapproval of the lower court's reliance on the NLRB's decision in *American Seating* for the proposition that the certification of a successor union automatically terminated a pre-existing collective bargaining agreement. As we held in *Abrams*

American Seating simply held that it was an unfair labor practice for an employer to refuse to bargain with a newly certified union upon the ground that it was bound by a prior contract with a former bargaining representative. It does not follow from this reasoning that until a new agreement is reached with a new bargaining representative, the old agreement, or at least those portions thereof necessary for the continuation of the employer-employee relationship, automatically ceased to exist. . . .

*Id.* Because we are not convinced that the alleged cessation of the bargaining relationship between Mulvaney and Local 38 would have automatically terminated the agreement—rather than simply render the contract voidable—we reject the employer's argument in support of *ipso facto* termination.

### B. *Strike in Violation of the No Strike Clause*

■ The company's second argument that the union's strike in violation of the agreement's no-strike clause, Article 10, § 8, terminated the agreement also fails to carry the day. In *Drake Bakeries, Inc. v. Local 50, American Bakery & Confectionery Workers International*, 370 U.S. 254, 261–63, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962), the Supreme Court rejected an employer's assertion that a strike by a union in violation of the no-strike clause of a collective bargaining agreement excused the employer from its arbitration obligations under that agreement. Mulvaney attempts to distinguish *Drake Bakeries* on the grounds that the employer in that case

had only sought to avoid arbitration of a singular issue, and had not claimed the contract had been repudiated as a whole. *See id.* at 261, 82 S.Ct. 1346 ("The company has not attempted, or claimed the right, either to terminate the entire contract or to extinguish permanently its obligations under the arbitration provisions.").

In *Local Union No. 721, United Packinghouse, Food and Allied Workers v. Needham Packing Co.,* 376 U.S. 247, 251, 84 S.Ct. 773, 11 L.Ed.2d 680 (1964), the Supreme Court instructed that *Drake Bakeries* should not be limited to its particular facts. *Needham Packing* expressed the view that although *Drake Bakeries* "relied in part on the employer's apparent intention not to terminate the contract altogether, more central to its conclusion was the view that there was no 'inflexible rule rigidly linking no-strike and arbitration clauses of every collective bargaining contract in every situation.'" *Id.* (quoting *Drake Bakeries,* 370 U.S. at 261, 82 S.Ct. 1346; *see also Ice Cream Drivers & Employees Union Local 757 v. Borden, Inc.,* 433 F.2d 41, 45 (2d Cir.1970) (holding that *Drake Bakeries* and *Needham Packing* stand for proposition that "arbitration rights are not necessarily forfeited by the breach of a no-strike clause"). Mulvaney's contention that its duty to arbitrate necessarily ended when the union breached the no-strike clause of the agreement therefore fails.

## II    The District Court Acted Beyond Its Authority

*Drake Bakeries* left open the possibility that a strike by a union in contravention of the no-strike clause of an agreement might constitute such a repudiation of the arbitration provision that the employer would be justified in rescinding the entire agreement. *See* 370 U.S. at 265, 82 S.Ct. 1346 ("We do not decide in this case that in no circumstances would a strike in violation of the no-strike clause contained in this or other contracts entitle the employer to rescind or abandon the entire contract or to declare its promise to arbitrate forever discharged or to refuse to arbitrate its damage claims against the union."). Following this lead, the district court found that the employer had properly rescinded the collective bargaining agreement after Local 38 repudiated the arbitration clause by calling a strike. *See Mulvaney Mech.,* 2000 WL 852430, at *3–*4.

The trial court found further support for its holding in *United Electrical, Radio and Machine Workers of America, Local 1113 v. NLRB,* 223 F.2d 338, 341–42 (D.C.Cir. 1955) (*Marathon Electric*), where the District of Columbia Circuit held that a union's strike in violation of both the no-strike clause of a collective bargaining agreement and § 8(d) of the NLRA "was a material breach which justified the subsequent rescission of the contract by the Company." *Marathon Electric* thus deemed it proper to apply the general contract principles of repudiation and rescission to the content of a labor agreement. *See id.* at 341.

Nonetheless, the authorities are divided regarding the wisdom of applying traditional contract principles to disputes concerning an alleged termination of a collective bargaining agreement. *Compare Children's Rehab. Ctr. v. Serv. Employees Int'l Union, Local No. 227,* 503 F.2d 1077, 1079 (3d Cir.1974) (holding that breach of no-strike clause of labor contract entitled employer to rescind the agreement), *and Boeing Airplane Co. v. Aeronautical Indus. Dist. Lodge No. 751,* 188 F.2d 356, 357 (9th Cir.1951) (per curiam) (same), *with United Steelworkers of Am. v. NLRB,* 530 F.2d 266, 280 (3d Cir.1976) (holding that union's breach of no-strike clause did not entitle employer to rescind contract

because "strict application of the doctrine of material breach derived from contract law is inconsistent with contemporary national labor policy"), *and Trailways of New England, Inc. v. Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Employees,* 343 F.2d 815, 817 (1st Cir.1965) (holding that company could not rescind labor contract following union's breach of no-strike clause). Without expressly recognizing this split in the case law, the district court followed the rule of *Marathon Electric* and its progeny by holding that "[t]he principle that a contracting party is released from its obligations if the other party repudiates the contract applies to collective bargaining agreements." *Mulvaney Mech.,* 2000 WL 852430, at *3.

A. *Repudiation by the Union's Strike*

█ We need not decide today to what extent traditional contract principles of repudiation and rescission apply in the labor context, for we think the district court acted beyond its authority in applying those principles in this case. In *Rochdale Village, Inc. v. Public Service Employees Union, Local No. 80,* 605 F.2d 1290, 1297 (2d Cir.1979), the employer, as here, attempted to avoid arbitration by claiming that the union had already repudiated the collective bargaining agreement upon which the union relied for arbitration. We held that the issue of whether a party had repudiated the collective bargaining agreement was itself subject to the arbitration clause of the contract, and that the district court had properly deferred resolution of this issue to the arbitrators. *See id.* While it is the province of the courts to decide whether parties to an agreement have actually agreed to arbitrate, once an agreement is found to exist the equitable defense of repudiation generally is reserved for the designated arbitrator. *See Controlled Sanitation Corp. v. Dist. 128 of the Int'l Ass'n of Machinists,* 524 F.2d

1324, 1330–32 (3d Cir.1976); *see also Int'l Union of Operating Eng'rs, Local 150 v. Flair Builders, Inc.,* 406 U.S. 487, 491–92, 92 S.Ct. 1710, 32 L.Ed.2d 248 (1972) (holding that once court determines parties have agreed to arbitrate, arbitrator should determine validity of equitable defense of laches); *cf. Sandvik v. Advent Int'l Corp.,* 220 F.3d 99, 106–07 (3d Cir.2000) (distinguishing in non-labor context between defenses that render contract void, and those that render it voidable, for arbitration purposes).

*Rochdale Village* involved a grievance arbitration clause rather than the present interest arbitration clause, *see Rochdale Vill.,* 605 F.2d at 1293, but we discern no principled reason to deviate from our holding that it is the arbitrator's province to rule upon an alleged repudiation. The relevant provision of the interest arbitration clause of the agreement broadly provides that "any controversy or dispute arising out of the failure of the parties to negotiate a renewal of [the] Agreement" shall be submitted to the Board. This language encompasses Local 38's strike, and the consequences thereof, as the work stoppage was precipitated by the failure of the parties to reach accord on a new agreement.

█ The Seventh Circuit, in a case particularly apposite, held that a claim by an employer that it had repudiated an agreement was subject to the interest arbitration provision contained in that agreement. *See Sheet Metal Workers Local Union No. 20 v. Baylor Heating & Air Conditioning, Inc.,* 877 F.2d 547, 551 (7th Cir.1989), *abrogated on other grounds by Int'l Union of Operating Eng'rs, Local 150 v. Rabine,* 161 F.3d 427, 431 (7th Cir.1998). As the court persuasively observed in *Baylor Heating*

The parties agreed to arbitrate "any controversy or dispute arising out of the

failure of the parties to negotiate a renewal of this Agreement." The Company then unilaterally repudiated the agreement and refused to negotiate a renewal. The Company's actions come within the scope of the broad arbitration clause that "clearly and unmistakably" evidences the parties' intent to arbitrate. *Id.* We adopt that rule and hold that when, as here, there is a broadly worded interest arbitration clause, the question of whether an agreement has been repudiated is to be determined by the arbitrator. *Cf. Rochdale Vill.*, 605 F.2d at 1297.

### B. *Repudiation During Proceedings*

■ Throughout its appellate brief, Mulvaney intimates that even if the strike by Local 38 did not serve to repudiate the agreement, the union forfeited its right to arbitrate by representing both before the NLRB and in federal district court that the contract had been terminated. The contention that Local 38's conduct during related administrative and judicial proceedings constituted a repudiation of the union's right to arbitration is also a matter subject to arbitration. *Cf. Flair Builders*, 406 U.S. at 491, 92 S.Ct. 1710 (holding that laches defense is for arbitrator to decide).

A number of circuits have fashioned an exception to the general rule that decisions regarding repudiation are for the arbitrator. These courts have reasoned that where the alleged repudiation or, as some phrase it "waiver," [1] occurred in the midst of proceedings directly before the district court itself, the court need not defer to the arbitrators. *See Reid Burton Constr., Inc.*

*v. Carpenters Dist. Council*, 535 F.2d 598, 603 (10th Cir.1976) ("Courts must, of course, maintain judicial control of their own proceedings. Such power, we assert, is broad enough to include a court's determination of the validity of equitable defenses arising out of the action of parties before the court."); *see also Cal. Trucking Ass'n v. Bhd. of Teamsters & Auto Truck Drivers, Local 70*, 679 F.2d 1275, 1282–84 (9th Cir.1982) (finding repudiation where union denied for three years in lawsuit that it was bound by collective bargaining agreement before invoking arbitration clause of that agreement); *Jones Motor Co. v. Chauffeurs, Teamsters & Helpers Local Union No. 633*, 671 F.2d 38, 43–44 (1st Cir.1982) (finding repudiation where neither party requested arbitration during course of proceedings); *Reid Burton Constr., Inc. v. Carpenters Dist. Council*, 614 F.2d 698, 702–03 (10th Cir.1980) (finding repudiation where union had denied that it was a party to the agreement but asserted arbitration clause as a defense in the proceeding).

These cases are inapposite to the facts in the present case. While the union vacillated regarding the status of the collective bargaining agreement following the strike, its position has remained constant in the instant dispute. Hence, while Local 38 asserted the agreement was terminated both when the Association brought suit before Judge Covello in district court to enjoin the strike, and when it sought certification as the official bargaining representative for the employees before an NLRB hearing officer, in the present matter be-

---

1. We have also used the concept of "waiver," which while somewhat similar to repudiation has distinct requirements of its own. *See, e.g., Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 24–25 (2d Cir.1995). Our waiver line of cases is premised on the notion that a party waived its right to arbitrate by first engaging in protracted litigation or by unreasonably delaying a request for arbitration, which thereby prejudiced its adversary. *See id.* at 25. The employer here maintains that Local 38's denials of the continued vitality of the agreement, standing alone and independent of prejudice, constituted a repudiation of the arbitration provision.

fore Judge Chatigny, the union's position has consistently been premised on the proposition that the Board's jurisdiction was proper because of the continued vitality of the agreement, including the interest arbitration clause.

The prerogative of federal courts to assume jurisdiction when the alleged repudiation occurred in their presence is premised on the view that "[m]aintenance of control and supervision over court proceedings is an inherent judicial function that surely includes the power to determine the validity of equitable defenses arising from the parties' conduct before the court." *California Trucking*, 679 F.2d at 1283. But the objective of preserving the judicial integrity of the proceedings is not implicated in the instant case, where the alleged repudiation occurred not before the district court itself, but rather in separate tribunals. *See Jones Motor Co.*, 671 F.2d at 43 (discussing repudiation and distinguishing between conduct that occurred prior to filing of complaint and conduct subsequent thereto). The Board is just as qualified as the district court to determine whether Local 38 repudiated its right to arbitrate. Thus, we should defer to its resolution of this issue. *See Local Union No. 370 of the Int'l Union of Operating Eng'rs v. Morrison–Knudsen Co.*, 786 F.2d 1356, 1358 (9th Cir.1986) (per curiam) (deferring to arbitrator because the alleged acts of repudiation were "not based on conduct that occurred during the proceedings below; they relate to conduct of the parties occurring *prior* to the action to compel arbitration").

■ Nor do we believe that it would have been appropriate for the district court to have invoked the discretionary doctrine of judicial estoppel. This doctrine precludes a party that successfully maintained a particular position in one legal proceeding, from assuming a contrary position in a later proceeding solely because of a change in interest. *New Hampshire v. Maine*, 532 U.S. 742, 121 S.Ct. 1808, 1814, 149 L.Ed.2d 968 (2001). Unlike our immediately preceding discussion of repudiation, judicial estoppel applies when the inconsistent representations occurred in a separate proceeding, *see Adler v. Pataki*, 185 F.3d 35, 41 n. 3 (2d Cir. 1999), including those that occur before an administrative tribunal, *see Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir.1999).

■ Local 38's vacillations regarding the status of the agreement do not satisfy our judicial estoppel standard. We have held that a party requesting judicial estoppel must demonstrate both that (1) the party against whom estoppel is sought has pursued an inconsistent factual position in an earlier proceeding, and (2) this prior inconsistent position was somehow adopted by the first court. *United States v. Hussein*, 178 F.3d 125, 130 (2d Cir.1999); *accord AXA Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus. Inc.*, 84 F.3d 622, 628 (2d Cir.1996). The union's inconsistent representations do not fulfill either of these requirements.

■ Local 38 has wavered concerning the practical ramifications of the union's strike upon the collective bargaining agreement, but such legal conclusions are not "inconsistent factual positions" as would ordinarily justify judicial estoppel. There is no indication that either Judge Covello, when deciding upon the Association's suit to enjoin the strike, or the NLRB, when reviewing the union's election proceedings, adopted Local 38's position that the agreement had already been terminated. Judicial estoppel is inappropriate without a showing that the prior tribunal adopted the original representations. *See Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1038 (2d Cir.1993) (holding

that a formal settlement between the parties does not provide the necessary level of judicial adoption to justify a finding of estoppel); *see also Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 98 (2d Cir.1997). As the invocation of the doctrine of judicial estoppel would have been unwarranted, the district court should have deferred to the Board's resolution regarding the agreement's continued vitality.

### III  Self Perpetuation of Interest Arbitration Clause

▮ The Board's arbitration award directed the company to execute a new 46–month collective bargaining agreement, with this agreement also to contain an interest arbitration clause. Although the district court erred in refusing to confirm the arbitration award, it is directed on remand to vacate the Board's inclusion of a second interest arbitration clause.

▮ An interest arbitration clause is void as contrary to public policy to the extent that it applies to nonmandatory subjects of bargaining, *i.e.*, subjects other than wages, hours and other terms and conditions of employment; this includes the insertion of a successor interest arbitration clause in a new agreement. *See NLRB v. Sheet Metal Workers Int'l Ass'n, Local Union No. 38*, 575 F.2d 394, 398–99 (2d Cir.1978) (*Elmsford*). We recognize, of course, that the inclusion of a new interest arbitration clause as part of an interest arbitration award leads to self-perpetuation problems, where having agreed to such a provision, a party may find itself locked into having that procedure imposed on it for as long as the bargaining relationship endures. *NLRB v. Columbus Printing Pressmen & Assistants' Union No. 252*, 543 F.2d 1161, 1169 (5th Cir.1976). Were we to condone self-perpetuation, parties would be constrained in their efforts to rid themselves of the interest arbitration clause, as the ultimate decision would rest with the arbitrator, who might have a predilection to again include the clause. *See id.; accord Milwaukee Newspaper & Graphic Communications Union Local No. 23 v. Newspapers, Inc.*, 586 F.2d 19, 21 (7th Cir.1978) (per curiam).

▮ Since interest arbitration clauses are enforceable only with respect to those disputed contract terms that are mandatory subjects of bargaining, *Elmsford*, 575 F.2d at 398, we will not confirm nonmandatory terms of an interest arbitration award. Our sister circuits have applied this concept to "second generation" interest arbitration clauses, that is, interest arbitration clauses included within an interest arbitration award, and have severed out those clauses while confirming the remainder of the award. *See Local 58, Int'l Bhd. of Elec. Workers v. Southeastern Mich. Chapter, Nat'l Elec. Contractors Ass'n*, 43 F.3d 1026, 1032 (6th Cir.1995); *Am. Metal Prods.*, 794 F.2d at 1457–58. We take the same common sense approach.

Both the parties' original agreement and the new agreement to be executed pursuant to the Board's award, contain a severability clause, providing that "[i]f, pursuant to federal or state law, any provision of the Agreement shall be found by a court of competent jurisdiction to be void or unenforceable, all of the other provisions of this Agreement shall remain in full force and effect." Because the nonmandatory terms of the Board's award have not been shown to be so fundamental that their absence would nullify the agreement as a whole, *see Sheet Metal Workers' Int'l Ass'n, Local 206 v. R.K. Burner Sheet Metal Inc.*, 859 F.2d 758, 761 (9th Cir.1988); *see also Local 58, Int'l Bhd. of Elec. Workers*, 43 F.3d at 1032 (relying upon severability clause to excise nonmandatory terms of interest arbitration award), we remand this case to

the district court for it to confirm the mandatory provisions of the arbitration award.

## CONCLUSION

For the reasons explained above, we vacate the judgment appealed from and remand the case to the district court for the entry of judgment confirming the mandatory terms of the National Adjustment Board's arbitration award and vacating that portion of the award that includes nonmandatory terms.